## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-30072 |
| | ) | |
| GREGORY TORAN, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

Currently pending are Defendant Gregory Toran's Motion to
Release Funds Held in Escrow for Gregory Toran (d/e 38) and
Supplemental Motion to Release Funds Held in Escrow for Gregory
Toran or, in the Alternative, Motion for Leave to Withdraw (d/e 56).
The Motions are granted in part and denied in part. The
Government has shown probable cause to believe that all of the
funds held in escrow related to the South Halsted properties and
$69,381.32 of the funds held in escrow related to the Vanderpoel
property are subject to forfeiture. Therefore, the Court will order
the release of only $49,555.38 of the escrowed funds.

# I. BACKGROUND

In September 2013, a grand jury indicted Toran on eight charges, including conspiracy to commit mail fraud and health care fraud, as well as the substantive charge of mail fraud. Tina M. Kimbrough was also indicted.

IBT Transportation, L.L.C., provides non-emergency transportation services to patients. Toran and Kimbrough were owners of all membership interest issued for IBT Transportation. The Indictment alleges that between December 1, 2005 and June 2011, Toran and Kimbrough set, implemented, and enforced policies and procedures at IBT Transportation to defraud Medicaid by submitting claims (through the Illinois Department of Health and Family Services (HFS)) for services that were either not rendered, not rendered to the extent claimed, or that included claims for mileage well in excess of that actually driven.

The Indictment also alleges that in August 2010 Toran and Kimbrough were made aware that IBT Transportation had been paid for services not rendered in 2010 in the amount of $476,172. Toran allegedly notified HFS that IBT Transportation was only overpaid $224,680.73 and kept the remainder of the money. Toran

and Kimbrough also allegedly continued to submit claims for services not rendered or not rendered to the extent billed. In all, Toran and Kimbrough allegedly defrauded the Medicaid program of at least $4 million.

The Indictment contains forfeiture allegations, seeking forfeiture of various bank accounts and real property that constitutes or is "derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses," including:

- 9544 South Vanderpoel Avenue, Chicago, Illinois

- 1450 West 112th Place, Chicago

- 28 Carrington Court, Hazel Crest, Illinois

- 5751 to 5759 South Halsted Street, Chicago (hereinafter referred to as 5751 South Halsted)

- 5741 South Halsted Street, Chicago

- 6978 West North Avenue, Chicago

- 1029 Des Plaines Avenue, Unit 503, Forest Park, Illinois

The Government also seeks forfeiture of substitute property if the property described above cannot be located, is transferred, is placed outside the jurisdiction of the court, is substantially diminished in value, or is commingled with other property which

cannot be divided without difficulty.  In addition, the United States

seeks a $4 million personal money judgment against Toran and

Kimbrough.

Following the return of the Indictment, the Government

caused to be filed a lis pendens with the Cook County Recorder of

Deeds regarding the properties subject to forfeiture.  When Toran

sought to sell the 5741 South Halsted, 5751 South Halsted

(collectively referred to as the Halsted properties) and the

Vanderpoel properties, the Government agreed to release its <u>lis

pendens</u> so long as the proceeds of the sale were put in escrow with

Toran's attorney.[1]  Specifically, in a letter dated November 7, 2013

and a letter dated February 7, 2014 to Toran's counsel, the

Government agreed to release its lis pendens so long as an escrow

of the funds was set up with defense counsel. <u>See</u> Letters (d/e 38-4,

38-5).   Although the letters differ slightly, both provide that the

money held will be available to pay any fines, restitution, civil

penalties, damages, and costs resulting from a conviction on the

---

[1] The Government asserts that it made this agreement instead of seeking a
restraining order under 18 U.S.C. § 982 and 21 U.S.C. § 853.  The Government
also states that the Government agreed not to seek forfeiture of funds already
transferred, although it could have sought forfeiture of such funds.  <u>See</u> Resp.
p. 3 (d/e 40).

conspiracy and mail fraud charges Toran faces.  However, the escrowed funds would not be used for any other purpose unless agreed to by the parties or upon order of the Court.  Toran netted $118,936.70 on the Vanderpoel property and $205,439.30 on the Halsted properties, for a total of $324,376.  <u>See</u> Def.'s Mot. ¶¶ 9, 10 (d/e 38).

Toran now seeks the release of $175,000 of the funds he received upon the sale of the Vanderpoel and South Halsted properties so that he can mount an effective defense.  This includes no less than $25,000 for obtaining hardware and software to review the large amounts of electronic discovery and documents.   Toran also indicates he needs the funds to pay his attorneys to prepare for a three-week trial, review documents, conduct the three-week trial, and for counsels' out-of-pocket expenses.

## II. LEGAL STANDARD

In the Indictment, the Government seeks forfeiture under 18 U.S.C. § 982(a)(7).  Section 982(a)(7) requires that the Court, when imposing a sentence on a person convicted of a Federal health care offense, order the person "to forfeit property, real or personal, that

constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense."  18 U.S.C. § 982(a)(7).

Section 982(b)(1) specifically incorporates some of the forfeiture provisions in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 853), including § 853(e), which allows the Government to secure a post-indictment, pre-conviction protective order to freeze assets.  See 18 U.S.C. § 982(b)(1); United States v. Kirschenbaum, 156 F.3d 784 (7th Cir. 1998).  Section 853(e) provides, in relevant part, as follows:

> Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) of this section for forfeiture under this section—
>
> (A) upon the filing of an indictment or information charging a violation  . . . for which criminal forfeiture may be ordered  . . . and alleging that the property with respect to which the order is sought, would, in the event of conviction, be subject to forfeiture under this section[.]

 21 U.S.C. § 853(e)(1)(A).

Following challenges that the forfeiture provisions violate a defendant's Sixth and Fifth Amendment rights, the United States Supreme Court found pretrial restraining orders under § 853(e)

constitutional so long as the order restraining the assets is "based on a finding of probable cause to believe that the property will ultimately be forfeitable." United States v. Monsanto, 491 U.S. 600, 615 n.10 (1989) (but declining to decide whether the Fifth Amendment right to due process requires a hearing to establish that there was probable cause to believe the defendant committed an offense permitting forfeiture and that the property at issue had the requisite connection to the crime); see also Caplin & Drysdale v. United States, 491 U.S. 617, 626 (1989) (a criminal defendant does not have a Sixth Amendment right to use illegally obtained funds to hire an attorney). The determination that there is probable cause to believe the property will ultimately be forfeitable has two parts: there must be probable cause to believe that (1) the defendant has committed an offense permitting forfeiture, and (2) the property at issue has the requisite connection to the crime. Kaley v. United States, 134 S. Ct. 1090, 1096 (2014).

An indicted defendant is not entitled to a hearing on the first issue—whether there is probable cause to believe that the defendant committed an offense permitting forfeiture—because "the grand jury's determination is conclusive." Kaley, 134 S. Ct. at 1099

(determining that an indicted defendant does not have a constitutional right to contest the grand jury's prior determination that there was probable cause to believe that the defendant committed an offense permitting forfeiture). The Supreme Court noted, in a footnote, that the same cannot necessarily be said of the forfeiture allegations:

> But the tracing of assets is a technical matter far removed from the grand jury's core competence and traditional function—to determine whether there is probable cause to think the defendant committed a crime. And the judge's finding that assets are not traceable to the crime charged in no way casts doubt on the prosecution itself. So that determination does not similarly undermine the grand jury or create internal contradictions within the criminal justice system.

Kaley, 134 S. Ct. at 1099 n. 9. The Kaley Court also noted that lower courts had generally been providing a hearing to an indicted defendant who sought the release of funds, at which the court would determine whether there was probable cause to believe that the assets were traceable or sufficiently related to the crime charged in the indictment. Id. at 1095. However, the Kaley Court did not express an opinion on that matter. Id. at 1095 n.3.

The Seventh Circuit held, prior to Kaley, that it violates the Fifth Amendment due process clause to restrain property without

requiring the Government to establish the factual basis for its assertions that the funds are subject to forfeiture if the defendant has demonstrated a bona fide need to use the assets to conduct his defense. United States v. Moya-Gomez, 860 F.2d 706, 730 (7th Cir. 1988); see also Kirschenbaum, 156 F.3d at 792 (finding no hearing required where the defendant failed to show a bona fide need to use some of the restrained assets to obtain counsel). Therefore, under Seventh Circuit law, if a defendant can demonstrate a bona fide need to use the assets to conduct his defense, the Government must demonstrate the basis for its assertion that the assets are subject to forfeiture (i.e., that there is probable cause to believe that the property at issue has the requisite connection to the crime). The Federal Rules of Evidence do not apply at the probable cause hearing. See United States v. Jones, 160 F. 3d 641, 647-48 (10th Cir. 1998).

### III. THE APRIL 27, 2015 EVIDENTIARY HEARING

Following an evidentiary hearing in February 2015 and supplemental briefing, this Court ultimately found that Toran demonstrated a bona fide need to use the assets to conduct his defense. See April 21, 2105 Text Order. The Court set the matter

for a hearing on April 27, 2015 for the Government to show probable cause to believe that the funds held in escrow are subject to forfeiture.

At the hearing, the Government presented the testimony of Tom Henrikson, an auditor with the United States Attorney's office, and Exhibits F1-1 through 20, F1-22 through 33, F1-35 through 53, and F1-55. Henrikson testified that the documents he reviewed to prepare the Exhibits included the bank records of IBT Transportation, Toran, and Kimbrough, as well as public record searches regarding different transfers of properties, and realtor and title records. The evidence presented at the hearing and in the pleadings filed includes the following.

IBT Transportation was incorporated in November 2005. Ex. F-1-29. Henrikson testified that Toran took out a Small Business Administration loan for $50,000 and he loaned $50,000 to IBT Transportation. IBT Transportation made all of the principal and interest payments to repay that loan and also made payments to Toran for repayment of the loan.

The Medicaid money IBT Transportation was paid was predominantly deposited into IBT Transportation's corporate

checking account ending in 1103 at Chase Bank.  Henrikson testified that the majority of the money that IBT Transportation billed Medicaid for transports that never happened was related to two entities, River Edge Hospital and Hartgrove Hospital.  The fraudulent amounts billed relating to those two entities alone, which began in late 2008, totaled approximately $4.5 million.  That $4.5 million constituted well over half and perhaps as much as 80% of IBT Transportation's income.  Based on the assumption that 80% of IBT Transportation's income was illegitimate, Henrikson testified that there was no way IBT Transportation could have paid all of its bills solely with legitimate money.

## A.      Evidence and Testimony Regarding the Vanderpoel Property

The Government claims that the proceeds from the Medicaid fraud are directly traceable to the Vanderpoel property.

Toran purchased the Vanderpoel property in October 1995. See Hr'g Ex. F1-28.  The purchase price was $115,000, and Toran obtained a mortgage in that same amount.  Toran asserts that he saved money from his job as a plumber to purchase the Vanderpoel property.  Aff. ¶ 4 (d/e 38-3).

Henrikson testified that between January 2009 through January 2011 (when the mortgage on the Vanderpoel property was paid in full), Toran received distributions totaling $506,000 from IBT Transportation account ending in 1103, which payments were above and beyond any salary.  See Hr'g Ex. F1-31 through F1-51 (checks through October 2010).  Most if not all of the checks were deposited into Toran's savings account.

Henrikson's testimony also suggested that like distributions were made to Kimbrough at the same time.  Henrikson testified that IBT Transportation's accountant told Kimbrough that if she took a distribution of equity or income from the company, a like distribution had to be made to Toran because the company was structured as an S corporation.

Henrikson testified that Toran's bank statement shows a transfer of $70,000 from Toran's savings account to Toran's checking account on January 13, 2011.  On that same date, an online payment in the amount of $69,381.32 was made to Wells Fargo Home Mortgage.  Hr'g Ex. F1-52.  Henrikson corroborated that with documents from Wells Fargo Home Mortgage to show that the payment paid the Vanderpoel property mortgage in full.  See

<u>also</u> Gov't Resp., Customer Account Activity Statement, Gov. Ex. 2D (d/e 40-2).  The same bank statement also shows a regular monthly mortgage payment of $1,203.96 made on December 30, 2010.  Hr'g Ex. F1-52.  Henrikson testified that the regular monthly payment was made out of Toran's account on a consistent basis from approximately January 2006.

In December 2013, Toran sold the Vanderpoel property for $135,000.  Hr'g Ex. F1-53.  He netted $118,936.70.  <u>Id.</u>  The Government concedes that Toran had $40,000 in equity on the Vanderpoel property at the time IBT Transportation came into existence.

## B.    Evidence and Testimony Regarding the 5741 and 5751 South Halsted Properties

IBT Transportation purchased 5741 South Halsted on January 16, 2009. [2]  <u>See</u> Limited Warranty Deed, Gov. Ex. 3A (d/e 40-3).  On January 29, 2009, Toran and Kimbrough executed a document assigning their personal interest in the contract to purchase 5741 South Halsted to IBT Transportation.  Hr'g Ex. F1-55.

---

[2] IBT Transportation purchased the property from IB Property Holdings, LLC. The Government asserts there is no known relationship beyond this transaction between IB Property Holdings, LLC and IBT Transportation, LLC, even though the names are similar.

Henrikson testified that that the funds from IBT Transportation's bank account ending in 1103 were used to purchase 5741 South Halsted.  Henrikson identified Exhibit F1-1 as a check from IBT Transportation's account ending in 1103 in amount of $5,000 payable to a realty company.  In addition, on January 29, 2009, Toran withdrew $63,821.06 from IBT Transportation's account ending in 1103.  Henrikson traced those funds to the closing statement, which shows $58,821.06 paid by the borrower.  See Hr'g Ex. F1-4.  A refund of the $5,000 down payment was made payable to Toran and deposited into IBT Transportation's account.  Hr'g Ex. F1-3.  Funds from the IBT Transportation account were also used to make improvements to the property at 5741 South Halsted.  See Hr'g Ex. F1-6 through F1-15 (totaling approximately $86,000).

In July 2012, IBT quitclaimed the property to Toran.  Hr'g Ex. F1-16 (signed by Toran and Kimbrough as members of IBT Transportation).  Henrikson testified that Toran and Kimbrough became aware in April 2011 that IBT Transportation was under investigation through a subpoena that was inadvertently served on

IBT Transportation.  Henrikson was not aware that any money changed hands to cause the quitclaim deed to be issued.

The property at 5751 South Halsted was purchased on October 22, 2010 by IBT Transportation from RLD Investments, Inc. for $122,214.76.  Hr'g Ex. F1-18, F1-19.  Henrikson testified that he traced the funds to purchase that property to IBT Transportation.

Specifically, the Escrow Trust Disbursement Statement shows two payments received from IBT Transportation, one in the amount of $1,390 and one in the amount of $120,824.76.  Hr'g Ex. F1-18. The October 2010 bank statement for IBT Transportation account ending in 1103 shows one electronic withdrawal on October 21, 2010 in the amount of $120,824.76 and one electronic withdrawal on October 22, 2010 in the amount of $1,390.  Id.  Henrikson testified that these two amounts equaled the purchase price of the property.  In addition, improvements to the property at 5751 South Halsted were paid out of IBT Transportation funds.  See Hr'g Ex. F1-22 through F1-25 (totaling approximately $55,000).

On February 14, 2012, the property at 5751 South Halsted was transferred by quitclaim deed to Toran.  Hr'g Ex. F1-26 (signed

by Toran and Kimbrough as members of IBT Transportation).  In July 2014, Toran sold the properties at 5741 and 5751 South Halsted to MJ Investments and Development LLC.  Hr'g Ex. F1-17, F1-27.  Toran asserts he netted $205,936.70 on the sale of the Halsted properties.  Def. Mot. ¶ 10 (d/e 38) (citing Exhibit B).

Henrikson testified that in his review of the bank statements for IBT Transportation, Toran, and Kimbrough, he did not find any evidence of monies coming from any other account (besides the IBT Transportation account ending in 1103) going to the purchase or the rehabilitation of the South Halsted properties.  The amount invested by IBT Transportation both in the sales price and the rehabilitation of the South Halsted properties totaled approximately $300,000.

## C.    Additional Testimony and Evidence

Toran asserts that he had close to $400,000 in proceeds long before the scheme alleged by the Government.  Toran provided a copy of his 2010 tax return which shows he had an adjusted gross income of $471,756.  See d/e 61-1.  The money came from wages ($69,667), taxable interest ($596), ordinary dividends ($454), IRA distributions ($3,184), "rental real estate, royalties, partnership, S

corporations, trusts, etc." ($396,655), and gambling winnings ($1,200). See d/e 61-1.

In further support of his assertion that he had substantial funds prior to when the Government claims the scheme started, Toran notes that in December 2001, he purchased 7758 South Wood for $185,000. Aff. ¶ 11 (d/e 46-1). He borrowed approximately $128,500 to purchase the property. Id. In late 2004, he sold South Wood for approximately $400,000, resulting in a profit of close to $250,000 on that property. Id. ¶ 12. Henrikson agreed that Toran had $200,000 in his bank account in December 2005 (prior to the formation of IBT Transportation).

## IV. ANALYSIS

The Government bears the burden of showing that there is probable cause to believe the assets are forfeitable. Under 18 U.S.C. § 982(a)(7), property is forfeitable if it "constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." "Probable cause is not a high bar." Kaley, 134 S. Ct. at 1103; see also, e.g., United States v. Kam, No. 10-CR-875, 2011 WL 3039589, at *5 (E.D. N.Y. Mar. 18, 2011) (although the government must show probable cause as to

forfeitability, "[w]ith respect to an account funded both by tainted and non-tainted funds, the burden is low).

In this case, the Government has shown probable cause to believe that the money in escrow from the South Halsted properties is forfeitable. The Indictment alleges that Toran and Kimbrough, who were owners of all membership interest issued for IBT Transportation, set, implemented, and enforced policies and procedures at IBT Transportation to defraud Medicaid by submitting claims for services that were either not rendered, not rendered to the extent claimed, or that included claims for mileage well in excess of that actually driven.

The Government presented evidence, through Henrikson's testimony, that the alleged proceeds of the Medicaid fraud were deposited into IBT Transportation's account ending in 1103. Henrikson testified that more than 50% and possibly as much as 80% of IBT Transportation's income came from fraudulent transportation billing related to two entities, which totaled approximately $4.5 million. Therefore, this Court can draw the inference that the majority of the Medicaid payments deposited in IBT Transportation's account ending in 1103 was allegedly proceeds

of the fraud.  Funds from IBT Transportation's account ending in 1103 were used to purchase the South Halsted properties and improve them.  The Court finds this evidence is sufficient to demonstrate probable cause to believe that the funds from the sale of the South Halsted properties are forfeitable.  See United States v. Melrose East Subdivision, 357 F.3d 493 (5th Cir. 2004) (finding the government showed probable cause to believe the properties were purchased with the proceeds of Medicaid fraud where the government presented persuasive evidence that the company was engaged in pervasive Medicaid fraud during the time period).

The Government does not have the same type of evidence with regard to the Vanderpoel property.  Toran purchased the property prior to the formation of IBT Transportation, and the parties agree that he had approximately $40,000 in equity in the property at the time IBT Transportation was formed.  After the formation of IBT Transportation, Toran continued to pay the mortgage on the property.  Toran had legitimate funds (from his work as a plumber and rental income) as well as the distributions from IBT Transportation that the Government alleges are proceeds of the fraud.

The Court finds that the Government has shown probable cause to believe that $69,381.32 of the escrowed funds constitutes or is derived from gross proceeds traceable to the commission of the fraud. In both September and October 2010, Toran received $50,000 in distributions from IBT Transportation account ending in 1103. That money was deposited in Toran's savings account. On January 13, 2011, Toran transferred $70,000 from his savings account to his checking account. On that same day, Toran made on online electronic payment to Wells Fargo Home Mortgage in the amount of $69,381.32. This paid off the mortgage on the Vanderpoel property.

However, the Government has not shown probable cause to believe the remaining funds in escrow relating to the Vanderpoel property are subject to forfeiture. The Court recognizes that the probable cause determination is a low burden. Nonetheless, the Court finds that the Government has only shown probable cause to believe that $69,381.32 of the funds related to the Vanderpoel property constitute or are derived from gross proceeds traceable to the commission of the offense. The Government has not pointed to any evidence to support the finding that the mortgage payments

made by Toran after January 2006 were likely made with tainted funds.  Moreover, the Government concedes that Defendant had $40,000 in equity in the property prior to the formation of IBT Transportation.  Therefore, the Court will release $49,555.38 (the amount in escrow attributable to the Vanderpoel property minus $69,381.32).  See, e.g. United States v. One Parcel of Real Property With Buildings, Appurtenances and Known as 170 Westfield Drive, Located in the Town of East Greenwich, Rhode Island, 34 F. Supp. 2d 107, 117 (D. Rhode Island 1999) ("Where a house was purchased with a mix of illicit and legitimate money, the government has an interest in the house up to the value of the illicit money").

Perhaps anticipating this result, the Government argues that any assets that are not directly forfeitable should still be restrained as substitute assets.  The Court disagrees.

The plain language of the relevant statutes demonstrates that pretrial restraint of substitute assets is not permitted.  As noted above, the Government seeks forfeiture under 18 United States Code Section 982(a)(7).  Section 982(b)(1) adopts the provisions of

21 United States Code Section 853 (except subsection (d)).  Section

853(a) identifies the property subject to forfeiture:

a) Property subject to criminal forfeiture

Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law—

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

(2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; and

(3) in the case of a person convicted of engaging in a continuing criminal enterprise in violation of section 848 of this title, the person shall forfeit, in addition to any property described in paragraph (1) or (2), any of his interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise.

21 U.S.C. § 853(a).  Pursuant to section 853(e), a court may enter a

restraining order or injunction or take any other action to preserve

the availability of property described in section 853(a).  21 U.S.C. §

853(e).

Substitute assets are addressed in section 853(p), which

provides that substitute assets shall be forfeited if, as a result of

any act or omission of the defendant, any of the property described

in section 853(a):

>(A) cannot be located upon exercise of due diligence;

>(B) has been transferred or sold to, or deposited with, a
>third party;

>(C) has been placed beyond the jurisdiction of the court;

>(D) has been substantially diminished in value; or

>(E) has been commingled with other property which
>cannot be divided without difficulty.

21 U.S.C. § 853(p)(1). If any of those circumstances exist, the court

shall order the forfeiture of any other property of the defendant up

to the value of the property described in subparagraphs (A) through

(E). 21 U.S.C. § 853(p)(2).

Nothing in section 853(p) or section 853(e) indicates that

substitute assets are subject to pretrial restraint like the property

described in section 853(a). Because subsection (e) permits pretrial

restraint of only those properties identified in subsection (a), and

because subsection (a) does not mention substitute assets,

subsection (e) does not authorize the pretrial restraint of substitute

assets. In fact, the majority of Circuits addressing the issue have

reached the same conclusion that pretrial restraint of substitute

assets is not permissible under 18 U.S.C. § 982 or 21 U.S.C. § 853.

See United States v. Parrett, 530 F.3d 422, 431 (6th Cir. 2008)

(holding that "the plain language of 21 U.S.C. § 853 conveys

Congress's intent to authorize the restraint of tainted assets prior to

trial, but not the restraint of substitute assets") (emphasis in

original); United States v. Field, 62 F. 3d 246, 249 (8th Cir. 1995)

(pretrial restraint of substitute assets not permitted under 18

U.S.C. § 982); United States v. Ripinsky, 20 F.3d 359, 362-63 (9th

Cir. 1994) (pretrial restraint of substitute assets not permitted

under 21 U.S.C. § 853); United States v. Floyd, 992 F.2d 498, 502

(5th Cir. 1993) (same); see also In re Assets of Martin, 1 F.3d 1351,

1359 (3rd Cir. 1993) (pretrial restraint of substitute assets not

permitted under 18 U.S.C. § 1963 (RICO)); but see In re Billman,

915 F.2d 916, 921 (4th Cir. 1990) (holding that pretrial restraint of

substitute assets that have been transferred to a third person were

subject to pretrial restraint under 18 U.S.C. § 1963 (RICO)); United

States v. Regan, 858 F.2d 115, 121 (2d Cir. 1983) (holding, under

18 U.S.C. § 1963, that "where the nature of the defendants'

forfeitable property makes the imposition of a restraining order

burdensome on third parties, the district court should, as an

alternative, restrain assets of the defendant equal in value to that of the unrestrained forfeitable property").

## V. CONCLUSION

For the reasons stated, Defendant Gregory Toran's Motion to Release Funds Held in Escrow for Gregory Toran (d/e 38) and Supplemental Motion to Release Funds Held in Escrow for Gregory Toran or, in the Alternative, Motion for Leave to Withdraw (d/e 56) are GRANTED IN PART and DENIED IN PART. The Court orders the release of $49,555.38 of the funds held in escrow. This amount constitutes the funds relating to the Vanderpoel property for which the Government failed to show probable cause to believe the funds constitute or are derived from gross proceeds traceable to the commission of the offense. The Motion for Leave to Withdraw is set for a status conference on May 11, 2015 at 11:00 a.m. In addition, the Final Pretrial Conference set for May 11, 2015 at 11:00 a.m. for both Defendants is changed to a Status Conference. Defendants and their counsel may appear by videoconference. If the attorneys do not have videoconferencing capability in their offices, they may contact the Clerk's Office, who will try to set up videoconferencing through the Northern District of Illinois.

ENTER: May 1, 2015

FOR THE COURT:

                    s/Sue E. Myerscough
                    SUE E. MYERSCOUGH
                    UNITED STATES DISTRICT JUDGE